**ESTONIAN STATE CARGO AND PASSENGER STEAMSHIP LINE, and Intervening Plaintiffs, Tallinna Laevaehisus (Tallinn Shipping Company), Josep Ferdinand Maipalu, by A. Nurmiste, Mandatory, Isaak Kain, Liquidator and Administrator of the Estates of Johannes Linkruus, Theodor Liiman, Isaak Kain, Julius Truuberk, and Johannes Inkapool,**

v.

**The UNITED STATES.**

No. 47862.

United States Court of Claims.
April 3, 1956.

P. A. Beck, New York City, for intervenors.

S. R. Gamer, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. Laurence H. Axman and Lino A. Graglia, New York City, on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

On December 1, 1953, we held that the original plaintiff in this case, which had been "nationalized" by the Presidium of the Provisional Supreme Soviet of the Estonian Soviet Socialist Republic, had no title to the steamship Maret at the time it was requisitioned by the defendant, which was on September 16, 1941, 116 F.Supp. 447, 126 Ct.Cl. 809.

This case is now before the court on the petition of the intervenors, to wit, Tallinna Laevaehisus (Tallinn Shipping Company), Josep Ferdinand Maipalu, by A. Nurmiste, Mandatory, Isaak Kain, Liquidator and Administrator of the Estates of Johannes Linkrüus, Theodor Liiman, Isaak Kain, Julius Truuberk, and Johannes Inkapool. Defendant does not

deny they are entitled to recover such sum for the requisition of their vessel as may be determined to be just compensation. The question presented is the just compensation to which they are entitled.

The intervenors presented three expert witnesses who testified on this question. One of them, a man by the name of Kjeldsen, based his testimony on the prices at which other vessels, which he thought were comparable to the Maret, had been sold, but he relied chiefly on the sale price of the Haifa Trader, which had been sold to the Irish Government by the Government of Palestine. This was sold for 82,500 pounds. The rate of exchange at that time was one pound for $4.02. Kjeldsen made allowance for the difference in age, tonnage, speed, and fuel consumption of the two vessels, and arrived at a value for the Maret of $353,628, provided the necessary repairs had been made to put her in class.

Bergland, another expert, based his valuation of the Maret on the value at which certain Swedish vessels were sold along about the time that the Maret was requisitioned. After making allowances for difference in age, tonnage, speed, and fuel consumption, Bergland arrived at the figure of $363,696 for the Maret.

The intervenors also introduced a man by the name of Bagger, who valued the Maret upon the basis of the cost of its reproduction, less depreciation. On this basis he arrived at a value of $338,000.

Defendant, on the other hand, introduced the testimony of a man by the name of Rutland, who fixed the value of the ship at $220,173, which was based upon sales of vessels both on the domestic and foreign markets.

■ Defendant also introduced the testimony of a man by the name of Pierot, who valued the vessel at $180,000, based upon the sale price of three British flag vessels, the sale of which was subject to restrictions on sales under the laws of Great Britain. But, making allowances for the fact that the Maret was not subject to the restrictions, he found the value of the Maret to be $180,000.

Pierot's estimate of $180,000 was based alone on the sale price of three British ships. We think these sales alone do not establish market value. The British Government had imposed severe restrictions on the sale and use of all British vessels. A fair valuation must take into account not only what an owner might be able to obtain on the British or American markets, but also on markets free of restrictions, because, after the libels had been discharged, the vessel could proceed anywhere a favorable price could be obtained. When Pierot compared the Maret with the Haifa Trader and used the price at which this vessel was sold, he arrived at the figure of $371,000.

The defendant also introduced the testimony of a man by the name of Sturm, who valued the Maret upon the basis of her reproduction cost. Sturm, however, thought that a much higher rate of depreciation should be taken on the vessel than the other witnesses. He thought that 4.77 percent was the proper rate, whereas the other witnesses thought that 2½ percent was proper. Applying the rate of 2½ per cent to Sturm's valuation, the reproduction value of the Maret, depreciated, is $396,780.

■ All of these valuations were based upon the making of the necessary repairs to put the vessel in sound or seaworthy condition, or, as otherwise expressed, to put her in class. There was a divergence of opinion as to the amount required to do so. The chief reason for this divergence of opinion was over the question of whether or not there should be deducted from the valuation put on these vessels the amount necessary to put her in class according to the standards of the American Bureau of Shipping or according to the standards then being applied by Lloyd's. When the witness said that their valuations were based on the vessel being in a sound or seaworthy condition, did they mean in the

condition required by the American Bureau of Shipping or by Lloyd's? Their testimony does not show what they meant.

Prior to the war Lloyd's required that a special survey be made of a vessel every three years, but beginning in 1940, after the war had started, Lloyd's waived this requirement and issued a certificate after a 'general inspection every year and the making of the necessary repairs indicated by this general inspection. On the other hand, the American Bureau of Shipping required a special survey of the vessel, which was a very much more detailed and intensive survey than the general inspection required by Lloyd's.

The defendant's witnesses testified to the cost of making the repairs indicated by this special survey made by the American Bureau of Shipping. Intervenors' witnesses testified to their estimate of what the cost would be to make the repairs which would probably be indicated by the general inspection required by Lloyd's. The special survey required by the American Bureau of Shipping showed that the cost of making the necessary repairs to put her in class according to the standards of the American Bureau of Shipping was $302,753; whereas intervenors' witnesses thought it would only cost about $35,000 to put her in class according to the standards then being applied by Lloyd's.

The testimony of intervenors' witnesses as to what might have been required as the result of a general inspection by Lloyd's is unsatisfactory because no such inspection was made by Lloyd's although on the day of the requisition of the vessel, Lloyd's agents did inspect her, and later took her out on a trial run, as the result of which she was authorized to proceed to a port in the West Indies to pick up a load for a port in the United States, but thereafter she was required to be put in dry-dock for cleaning and overhauling. The witnesses testifying to cost of the necessary repairs had never seen the ship and did not know her condition. On the other hand,

the testimony of the cost of putting her in class according to the standards of the American Bureau of Shipping is definite, made up after the work had been done and the cost was known. About the only uncertainty about it is that the work was done on a cost-plus basis, and the witnesses had to estimate what the difference would be between the cost of the work done on this basis and what it would have cost had it been done on a bid basis. Another uncertainty arises from the fact that considerably more work was done on the vessel than merely the work necessary to put the vessel in class; a good many improvements were made on the vessel; hence, the witnesses' judgment had to be exercised in allocating items to what was necessary to put the vessel in class and what for improvements. The figure of $302,000 is what they say is the proper figure after having allowed for the fact that the work was done on a cost-plus basis, and after having allocated to the cost of putting her in class only such items as are properly attributable thereto.

We see no reason why the owners of this vessel would have changed her registry from Lloyd's to the American Bureau of Shipping. It would have been expensive to have done so, and there was no necessity for doing so, so far as the record discloses. Certain it is that it would have cost much less to have made the repairs indicated by a general survey of the ship than those indicated by a special survey. The proper amount to deduct from the valuation of the experts as the cost of putting the vessel in class lies somewhere between $35,000 and $302,000. The Commissioner of this court has found that the proper amount to be deducted is $175,000. We see no reason to disagree with this figure.

Deducting this figure from the average of the valuation put on the vessel by intervenors' expert witnesses, leaves $176.741. This, we take it, is the composite opinion of intervenors' expert witnesses of the value of the vessel in her condition when requisitioned. Deduct-

ing the $175,000 from the average value put on the vessel in sound condition by defendant's experts, after adjusting the rate of depreciation, leaves $90,651, which is their composite opinion of the value of the vessel when requisitioned.

■ These valuations do not take into account the fact that the title to the vessel was in dispute at the time it was requisitioned. The Soviet Government, on the one hand, was claiming title, and the former Estonian owners, on the other hand, were claiming title. Litigation over the vessel began in August 1940, while the vessel was in the harbor of St. Thomas, Virgin Islands. It continued in the District Court of the United States until November 17, 1941, when a motion was made to stay further proceedings indefinitely. Thereafter, on August 22, 1947, the Estonian State Cargo and Passenger Steamship Line, which had been nationalized by the Soviet Republic, filed a petition in this court claiming title to the vessel, and on March 4, 1948, the former Estonian owners filed a motion to intervene, which was allowed, and intervenors' petition was filed April 16, 1948. Title to the vessel was not adjudged until our opinion of December 1, 1953, 116 F.Supp. 447, 126 Ct.Cl. 809.

This dispute over the title to the vessel of course affected its market value. As one witness expressed it, only a gambler would buy the ship. All of the witnesses who were interrogated on this subject admitted, of course, this dispute over title would seriously affect its market value. Ordinarily, just compensation is what the owner could get for his property on a free market. On account of the claim of the Soviet Republic, it is doubtful that intervenors could have sold the vessel at all. But, on the other hand, this dispute over title did not particularly concern the defendant. Under its power of eminent domain it could take the vessel and keep it and pay no one until the rightful owner had been determined. The dispute over the title did not affect the value of the vessel to the defendant.

The dispute over the title greatly minimized the value to the intervenors, if they had been required to sell it before the cloud on their title had been removed. It seems unjust that their recovery should be limited to what they could have gotten for the vessel before the cloud had been removed. The defendant is not entitled to choose a time for the taking which puts the owners to a disadvantage, and then take advantage of the owner's misfortune in fixing just compensation. Somewhere between what the vessel was worth to the defendant and what the owners could have gotten for it lies just compensation. According to defendant's experts, it was worth to the defendant about $90,000; according to intervenors' experts, about $176,000. We shall assume it was worth $150,000 to defendant. In view of the dispute as to title we think $100,000 is just compensation to the owners.

To this is to be added the agreed value of the consumable stores on board, amounting to $7,707.21, and from the sum is to be subtracted the amount the defendant spent to discharge liens, amounting to $20,842. This leaves the amount of $86,865.21.

■ In view of the conflict over title, we think the defendant is excused for not having made payment heretofore or until after the time for filing petition for writ of certiorari expires; therefore, intervenors are not entitled to have included in just compensation any sum for delay in payment.

Judgment will be entered in favor of the intervenors for $86,865.21. It is so ordered.

JONES, Chief Judge, and LARAMORE and LITTLETON, Judges, concur.

MADDEN, Judge, concurs in the result.